Nott, J.,
delivered tlie opinion of the Court.
This is a suit brought to recover $1,670 66, arrearages of pension for a period of about twenty-one years, (March 4, 1836, to January 21, 1857.)
In 1793 (October 24) the claimant, a girl of 17 years, is married to Abraham Oamer, a soldier of the Revolution. Forty-two years later Abraham Oamer dies, (August 25, 1835.) Four years after his death (July S, 1839) the claimant, now a woman of 59, is married to Anthony Poucher. After eighteen years (January 21, 1857) he also dies. In the same year the claimant applies to the Commissioner of Pensions for her pension a3 the widow of a revolutionary soldier. The Commissioner declines to allow her pension during her first widowhood, under the acts of 1838 (July 7) and 1848, (July 29,) for the reason that the proofs " do not satisfactorily show that she intermarried with Abraham Oamer prior to the 1st of January, 1794,” as required by those acts; hut he does allow it under the act of February 3, 1853, “ which grants pensions irrespective of the date of the marriage.” This pension, so granted, is made to commence on the day that her second husband dies, and is refused for any period during her second coverture. And it is for these arrearages, extending from March 3, 1836, to January 21, 1857, (excepting an interval from March 4, 1846, to March 4, 1848,) that she brings this suit. There is no record of her first marriage; her parents long since are dead, and she was the oldest of seventeen children.
*208 There are presented to us, therefore, two questions: I. Is the evidence that her marriage was prior to January 1, 1794, sufficient? II. Is she entitled to a pension while the wife of a second husband ?
I. As to the first question, it is proved that the claimant was bom in 1776 — a memorable year, and one not likely to be forgotten or mistaken in the family annals. The Dutch church of Copake, N. Y., in the record of those admitted to its communion, contains this entry :
“ Seoond day of May, 1795. On confession of her faith, Elizabeth Link, wife of Abraham Camer.”
This establishes the fact that she was his wife soon after, but does not establish the fact that she was his wife before the 1st of January, 1794. It is also shown that no family record exists of births, and that there was no church record of baptisms. The claimant herself testifies as a witness in the case, but hesitates to name the year of her marriage. She, however, avers postively that “it was the same year that Hannah Post, my sister, was born;” and also that “ Hannah, my sister, was then a nursing babe.” Therefore, it becomes desirable to fix the age of this sister, Hannah Post.
Hannah Post is living. But in her deposition, filed in the Pension Office, she says that “ ghe has no 'record of her age, and does not know how old she is, nor what month or day of the month or year in which she was born.” The age of Hannah Post must, therefore, be shown, if at all, by circumstantial evidence-; and the claimant proposes to show it in this somewhat singular way.
Her two brothers, Henry and Joseph Link, testify that their mother declared in her lifetime that there “ was about one year and nine months between all of her children’''
This statement of the mother, trivial in itself, and barely admissible in evidence as a declaration indirectly showing the relative ages of her children, is utterly overthrown by the facts which these same witnesses establish, and which may be thus stated:
The claimant was born May 8, 1776, and was the first child. Henry was the seventh child. Reckoning these six intervals at one year and nine months each will give us a period of ten years and six months between the claimant and Henry, and will place his birth in November, ’S6. It did not occur till November, ’88. Joseph was the thirteenth child. Reckoning the twelve intervals between him and the claimant as before, will place his birth in May, ’97. It did not occur till April, ’98. Joseph was also the sixth child after Henry. Reckoning these six intervals as before will place his birth in May, ’99 ; but it occurred in April, ’98.
*209 If now we apply her statement to the question of Hannah’s age, we shall obtain three different results, viz : Beckoning from the claimant will place her birth at April 8, ’92; from Henry, at February 25, ’94 ; and from Joseph, at January 5, ’93. In short, the mother’s statement is but an illustration of the utter worthlessness of such assertions.
Apart from this illusive theory, the evidence does show that Hannah Post was the third child after Henry, and that she was also the third child before Joseph. The elder of three brothers was born November 25, 1788 ; the younger April 5, 1798. A date midway between these two would fall on the 31st July, 1793, three months before the alleged time of the claimant’s wedding, (October 24,) at which time Hannah Post “ was a nursing babe,” and would furnish a slight presumption that 1793 was .the year of Hannah’s birth.
Further than this, the claimant testifies postively that she was in her eighteenth year at the time of her marriage. It was an event of too much importance to be lightly remembered, and at that age must have made a deep, ineffaceable impression on her girlish memory. The name of the year, to one who had little use for arbitrary dates, easily might fade out and be lost; but the age at which she was first married could not possibly be worn away from a woman’s mind. Her two brothers show the family tradition that she — the eldest and first wedded child — was married at the age of seventeen. The elder of the brothers was then a boy of five or six, and he was present at the wedding ; the younger has heard the fact spoken of by bolh his father and mother, and they agreed that she was “in her seventeenth year when she married said Abraham Camer;” by which we understand them to mean that she was seventeen, and thereby to corroborate the claimant's more exact testimony.
Our conclusion is that the evidence, though slight, is sufficient, and that she was entitled to a pension under the act of July 7, 1838, as extended by the resolution of August 16, 1842.
II. Is the claimant entitled to this pension while the wife of a second husband %
The language of the statute under which this arrearage is claimed is this, (act August 23,1842, § 1:) “ The marriage of the widow after the death of her husband for whose services she claims a pension under the act of the 7 th July, 1838, shall be no bar to the claim of such widow to the benefit of that act, she being a widoiv at the time she makes application for a pension.
*210 This distinguishes, we think, between the title to the pension and the application for its money. An existing marriage bars the latter, but by the express words of the act does not bar the former. To hold that it bars both is to disregard its terms, and to deny it all effect, on the act of 1838, of which it is declared to be amendatory.
In determining the legislative intent of this statute, two things are to be considered. 1st. That the pension referred to was not a pension for life, but an annuity for a fixed and limited period. 2d. That this period had expired when the amendatory act was passed.
We think its purpose is to secure to the widow personally that-which the law recognizes as properly hers, viz : a pension for five-years, and to prevent that which accrued from the first husband’s services from going to the second husband, as it would if it came to her possession during the coverture. And this is the effect of letting the title accrue to her during the second coverture, and preventing the application for the money till she is a widow again. Otherwise we do-not see how the marriage can be “no bar” to the “benefit” of the act of 1838.
For these reasons we think the claimant entitled to a pension of $80-per annum for five years from March 4, 1836.
The act of 1843, March 3, extends both of the previous acts for the “ term of one year from the 4th March, 1843.”
The act of June 7, 1844, extends the act of 1843 for “ the term of four years from and after the 4th day of March, 1844.”
So that these two acts extend her pension five years, viz :' from 4th March, 1843, to 4th March, 1848.
But the claimant also insists that her pension was further extended under the act of February 2, 1848. That act gives to a widow married before the 1st of January, 1794, her husband’s pension from 4th March, 1848, for and during her natural life. It adopts throughout the precise phraseology of the act of 1838, and contains the same proviso, viz : “ Provided, That in the event of the marriage of such widow said annuity or pension shall be discontinued.” These words have here the same meaning as in the act of 1838.
The petitioner claims that the acts are in pari materia, and are to be construed together; so that the act of 1842, removing the bar of a second marriage, would qualify and affect the act of 1848, as it did that of 1838. But the proviso that the second marriage shall discontinue the pension is express in the act of 1848, and inconsistent with the act of 1842; so that if the two acts were construed together as *211 different sections of the same act, the proviso in 1848, as the later enactment, would repeal the act of 1842.
The act of 1842 was not declaratory of the act of 1838, and did not purport to construe it; hut it was amendatory of it, and so declared to be in the act of March 3, 1843; and it therefore altered the act of 1838, by repealing in effect the proviso that by a marriage “ the annuity or pension shall be discontinued.” And the same proviso can be removed from the act of 1848 only in the same way — by a statute repealing it, and there is none.
There is no injustice done to the claimant by this construction of these statutes. The theory of military pensions is that the government will maintain those who have been deprived of the support which a father, a husband, or a son might have provided if he had not devoted himself to the military service of his country. There is indeed a class for whom something more might be urged. It comprises those wives and mothers who have borne the bitterer part of the sacrifice, in giving their husbands and sons to their country during the existence of actual war. For their influence in sending them, or for their consent in yielding them, we may admit the nation should be ever grateful, and between them and the government might exist a direct equity which no subsequent act on their part should be allowed to obliterate. But for the claimant no such reason exists. She exerted no such influence; she made no such sacrifice. When the Revolution began she was not yet born; when the Declaration was signed she was an infant of less than two months old; when her husband left the service she was a little girl of six years; when they were married the war had been for twelve years ended. The country, therefore, owes to her nothing for herself, and what it gives it gives to her solely as the relict of one of its earliest soldiers.
After living as his wife for a period much exceeding the average of married life, she is left by him with a claim upon the generosity of his country. After attaining an age much exceeding the average of human life, she voluntarily lays aside his name and ceases to be his widow. Now she seeks to return to the condition of her first widowhood, and, without resuming the name of the deceased soldier, to draw to herself the advantages of having been his wife. Out of its great gratitude, and lest one so closely connected with one of the patriot founders o'f the republic should suffer want, the government willingly accedes to her demand. But she goes still further, and requires that her pension for life shall extend hack and take in ten years of her second coverture. The answer to the application is that the government owes no *212 support or maintenance to the wife of a private citizen. The support of the wife is the responsibility of the husband. Upon nothing short of olear and positive enactments can the defendants be required to give to a woman the pension of one husband while she is being supported by another. The statutes referred to are not such enactments, and the construction contended for is beyond the letter, the spirit, and the intent of the law.
Messrs. Carlisle and McPherson for claimant.
Mr. J. J. Weed, Assistant Solicitor, for the government.
Judgment is given in favor of the claimant for the amount of her pension from March 3, 1836, to March 3, 1841, and from March 4, 1843, to March 4, 1848, being for ten years, at $80 per annum, the sum of eight hundred dollars.